IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT J. BOYDEN, SR. :  CIVIL ACTION
           :
 v.        :
           :
TOWNSHIP OF UPPER DARBY, :
et al.         :  NO. 13-5434

MEMORANDUM

Dalzell, J.            March 24, 2014

## I. <u>Introduction</u>

We consider here defendants Township of Upper Darby ("the Township" or "Upper Darby") and Officer William Sides's motion to dismiss plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Robert J. Boyden, Sr. brings this action against the defendants pursuant to 42 U.S.C. § 1983 and state tort law claiming that the defendants violated his Fourth Amendment rights by using excessive force when arresting him, and that in doing so Officer Sides also committed assault and battery on Boyden.

We have federal question jurisdiction over Counts I and II -- Boyden's § 1983 claims pursuant to 28 U.S.C. § 1331 -- and supplemental jurisdiction over Count III -- asserting Boyden's state law claims pursuant to 28 U.S.C. § 1367.

The defendants move to dismiss the § 1983 claim against Officer Sides on the ground that Boyden has failed to state a claim for any violation of a constitutional right, and that, even if he has, Officer Sides is entitled to qualified immunity.  <u>See</u> Def. Resp. at 6-7.  They also rely on this argument in their motion to dismiss the claim against the Township, and add that Boyden has failed to allege liability under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978),

because he acknowledges that the use of excessive force is a violation of Upper Darby's policies, and has failed to allege conduct by a policymaker.  Id. at 11.  Finally, the defendants argue that the assault and battery claim must fail because Officer Sides was using only the force necessary to effectuate the arrest.  Id. at 15.

## II.    <u>Standard Of Review</u>

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that the plaintiff has failed to state a claim for relief, <u>see</u> Fed. R. Civ. P. 12(b)(6); <u>see also, e.g.</u>, <u>Hedges v. U.S.</u>, 404 F.3d 744, 750 (3d Cir. 2005).  As the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), in order to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'", <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged", <u>Iqbal</u>, 556 U.S. at 678.

As the Supreme Court has stressed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action . . . do not suffice."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555 for the proposition that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

In the wake of <u>Twombly</u> and <u>Iqbal</u>, our Court of Appeals has laid out a two-part test to apply when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> First, the factual and legal elements of a claim should be separated.
> The district court must accept all of the complaint's well-pleaded facts

as true, but may disregard any legal conclusions.  Second, a district
court must then determine whether the facts alleged in the complaint
are sufficient to show that the plaintiff has a 'plausible claim for
relief.'

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  We thus begin by reciting the

facts as they appear in the amended complaint (hereinafter "Comp.").

In deciding a motion to dismiss, we may consider "the allegations contained in the

complaint, exhibits attached to the complaint and matters of public record", and any

"undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss

if the plaintiff's claims are based on the document."  Pension Benefits Guar. Corp. v. White

Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).


III.    **Facts**

Boyden is a forty-two-year-old man from Lansdowne, Pennsylvania.  According

to the Affidavit of Probable Cause attached to Boyden's motion to dismiss, on October 20, 2012,

at about "1209hrs", Delaware County dispatch summoned Officer Jonathan Resinski to the area

of School Lane and Irvington Road in Upper Darby and reported that a white male in his early

forties was "staggering about the street" and then "had climbed the wall of the Arlington

Cemetery and walked over to a tree and laid down underneath of it."  Police Criminal Complaint,

Affidavit of Probable Cause, Comp. Ex. A, at 1.  Officer Resinski arrived at the scene, and at

some point Officers Joseph DiFrancesco and Sides arrived, each in his own car.  See id.

(referring to "Officer Joseph DiFrancesco #40 in full uniform and operating marked unit # 14"

and "Officer William Sides #87 in full uniform and operating marked unit #22").

In his affidavit Officer Resinski says that when he arrived Boyden was lying face

up on the ground, and when Officer Resinski spoke to Boyden, Boyden said "he was sun tanning

in the cemetery." Id.  According to Officer Resinski, "[p]olice observed [Boyden's] speech to be slurred and an odor of an alcoholic beverage coming from his person." Id.  The police asked for Boyden's name and date of birth, and Boyden responded, "[w]hat the fuck do you need that for" and "you guys already know who I am". Id.  Officer Resinski reported that Boyden "was handcuffed while seated on the ground and taken into custody." Id.  The officers then "escorted" Boyden to Officer Resinski's police car, and while he was on the way to the car he "began to refuse to walk asking, 'What the fuck are you locking me up for now this time?'" Id.  Officer Resinski reported that Boyden

> had a wrist lock applied to his right hand by this Officer and was escorted to my marked vehicle.  When Police and the defendant had arrived to the location of my marked unit # 24, the defendant refused to sit in the back of the unit.  The subject was verbally directed five times by Police to sit in the back of the unit.  Upon each request, the defendant asked, "What are you some kinda tough guy?" and "what are you gonna do, beat me . . . go ahead!"  It was at this point, Officer William Sides #87 in full uniform and operating marked unit #22 of the Upper Darby Township Police department, withdrew his yellow X26 Taser from its holster, withdrew the cartridge and ordered the defendant into the vehicle or he would be tased.  The defendant refused exclaiming, "Go ahead and fucking tase me you tough guy!!"  The defendant continued to actively resist and Officer Sides did taser the defendant in his stomach at which point the defendant cooperated with Police and sat in the back seat of the patrol vehicle.

Id.

It thus appears that the officers handcuffed Boyden while he was on the ground, Boyden then stood up, walked to Officer Resinski's car, and orally resisted getting in.  Boyden used belligerent language, but it is not clear from this account how he physically resisted, as the affidavit says only that he "actively resist[ed]." Id.  Boyden avers that he "show[ed] no attempt to resist." Comp. ¶ 18.

4

Boyden pled guilty to the charge of "Disorderly Conduct Engage In Fighting" for his behavior on October 20, 2012 and the Commonwealth dropped the charge of "Resist Arrest/Other Law Enforce". <u>See</u> Criminal Docket, Court of Common Pleas of Delaware County, Def. MTD Ex. C at 3.

Boyden avers that "the use of excessive force was, is, and remains a part of a customary practice of the Police Department for the Township of Upper Darby,", Comp. ¶ 19, and says that the "Township has a long-standing custom of employing unnecessary force upon the constituents it serves and of failing to train and/or discipline officers as to professionalism and the proportionate use of force." <u>Id.</u>  In support, Boyden says that in 2013 Mayor Thomas Micozzie fired Officers Michael Givens and Ryan Wiseley for using excessive force against a juvenile and that the officers have since been reinstated despite Mayor Micozzie's statement that they had committed a "violation of Township and Police Department Policy and Procedure." <u>Id.</u> ¶ 20, n.1.

Boyden argues that "the Township of Upper Darby by and through policymaker, Superintendent Chitwood, ha[s] wholly failed in the duty to instruct, supervise, control, and discipline William Sides on a continuing basis by allowing him to unlawfully, and maliciously employ excessive force against natural persons", <u>id.</u> ¶ 32.  He contends that "Superintendent Michael Chitwood and Upper Darby Township, had knowledge . . . that William Sides was about to or likely to commit the wrongs as described", <u>id.</u>, and that the Township "had the power to prevent or otherwise aid in preventing the commission of the unlawful use of excessive force by training Officer Sides how to properly interact with citizens." <u>Id.</u> at ¶ 34.  The Township's failure to prevent the alleged excessive force, Boyden claims, "reflects deliberate indifference to

the constitutional rights of its constituents." Id. at ¶ 38.  He alleges that this "deliberate indifference" is the "moving force" behind his injuries.  Id. at ¶ 39.

Boyden also cites Yormie v. Upper Darby Police Officer One, No. 12-5609 (E.D. Pa. 2012), and Montgomery v. Sharp, No. 12-5346 (E.D. Pa. 2012), as examples of the use of excessive force by the Upper Darby Police Department.  Id. at ¶ 21.[1]  In those cases, the plaintiffs alleged that other Upper Darby police officers had used excessive force -- not including the use of a Taser -- in arresting them.  It appears that both cases settled.

Finally, Boyden avers, upon information and belief, that "state and/or federal authorities" are currently investigating a "police beating of Giovanni Mucci" on September 13, 2013, in which Officer Sides participated and during which Officer Sides used his Taser repeatedly.  Id. ¶¶ 22-23.

Boyden thus argues that "[t]he Township has demonstrated deliberate indifference to the natural and constitutional rights of its constituents . . . by failing to correct the customary use of excessive force within its jurisdiction."  Id. at ¶ 25.  Here, Boyden argues that Officer Sides's Tasering of him "remains unpunished, despite [Police] Superintendent [Michael] Chitwood's knowledge of the October 20, 2012 incident."  Id. at ¶ 30.

IV.   **Discussion**

   A.   **Excessive Force Claim Against**
        **Officer William Sides Pursuant To 28 U.S.C. § 1983**

        1.   **Qualified Immunity**

---

[1] Boyden also refers to Nguyen v. Township of Upper Darby, No. 12-116 (E.D. Pa. 2012), but this civil action number appears to be incorrect as no case with these parties is listed under this Civil Action number on ECF.

Officer Sides argues that Boyden has failed to allege facts sufficient to "state a claim for excessive force", but he says that even "[a]ssuming, arguendo, that Plaintiff's Amended Complaint states a claim for excessive force . . . Officer Sides[] is entitled to dismissal on grounds of qualified immunity."  Def. MTD at 7.

As the Supreme Court has explained, "the qualified-immunity defense shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Behrens v. Pelletier, 516 U.S. 299, 305 (1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal alterations omitted)).  Qualified immunity is "an immunity from suit rather than a mere defense to liability", and so the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) and Hunter v. Bryant, 502 U.S. 224, 227 (1991)).  Nevertheless, our Court of Appeals has cautioned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Newland v. Reehorst, 328 Fed. Appx. 788, 791 n.3 (3d Cir. 2009); see also, e.g., Mitchell v. Twp. of Willingboro, 913 F. Supp. 2d 62, 67 (D.N.J. 2012) (quoting Newland for this proposition and rejecting qualified immunity defense at the Rule 12(b)(6) stage).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step process for addressing claims of qualified immunity:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry. . . . if a violation could be made out on a

> favorable view of the parties' submissions, the next, sequential
> step is to ask whether the right was clearly established.

Id. at 201.  But eight years later in Pearson the Supreme Court held that this process should be

optional and "should not be regarded as an inflexible requirement", Pearson, 555 U.S. at 227.

The Court explained that "though [the Saucier sequence] should no longer be regarded as

mandatory", it "is often beneficial", id. at 236.  We use this sequence to guide our analysis here.

### a.  <u>Excessive Force</u>

We first consider whether, reading Boyden's allegations in the light most

favorable to him, he has alleged facts sufficient to state a claim that the defendants' conduct

violated a constitutional right.  As noted, Boyden brings his claim pursuant to 42 U.S.C. § 1983

arguing that Officer Sides used excessive force in arresting him in violation of his Fourth

Amendment rights.

The Supreme Court has explained that "[w]here, as here, the excessive force

claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly

characterized as one invoking the protections of the Fourth Amendment, which guarantees

citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures'", Graham

v. Connor, 490 U.S. 386, 394 (1989).  We thus analyze excessive force claims in the arrest

context under the Fourth Amendment's "objective reasonableness" standard, see, e.g., Curley v.

Klem, 499 F.3d 199, 206 (3d Cir. 2007) (citing Graham, 490 U.S. at 388), and so "to state a

claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff

must show that a seizure occurred and that it was unreasonable."  Estate of Smith v. Marasco,

430 F.3d 140, 148 (3d Cir. 2005) (internal quotations and alterations omitted).

Because a seizure did occur when the police arrested Boyden, our inquiry is whether the force used to effect that seizure was excessive, and thus unreasonable.  The reasonableness assessment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham, 490 U.S. at 396 (internal quotations omitted).  It is well-settled that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).  Determining whether any officer used excessive force -- force beyond that which the threat justified -- "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.

Moreover, both the Supreme Court and our Court of Appeals have cautioned that we must judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004) (quoting Graham, 490 U.S. at 396).  Finally, the inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397.

The defendants contend that "it cannot be reasonably inferred that the use of a taser must be unlawful if the arrestee is already handcuffed", Def. MTD at 6, and that the statements Boyden made while the officers were arresting him "establish[] that the use of the

taser was reasonable", <u>id.</u> at 7.[2]  Moreover, the defendants contend that because Boyden pled to the misdemeanor of disorderly conduct, he is "estopped from making any allegation here that he cooperated with police." <u>Id.</u>

Boyden cites several cases[3] in which courts have considered excessive force claims where police have Tasered handcuffed arrestees, and concludes that according to those cases the facts as pled here and contained in the police affidavit, attached, support a claim that the use of the Taser was unreasonable in this case.  Pl. Resp. at 6-8.

The three factors the Supreme Court identified in <u>Graham</u> -- the severity of the underlying crime, the potential danger to those involved, and any attempt by the suspect to evade arrest -- guide our analysis of other cases in which courts have addressed the use of a Taser on a handcuffed arrestee.  In our assessment, courts have generally found the use of a Taser on a handcuffed arrestee reasonable where the facts show that the suspect posed an immediate threat to a valid law enforcement aim -- for example, the suspect's conduct threatened his own safety or officers' safety or the suspect attempted to destroy evidence.  In the absence of an immediate threat to a valid law enforcement aim, courts in this Circuit have found that we cannot conclude that the use of a Taser is reasonable at the motion to dismiss stage.

---

[2] The use of this device in this case presents at the threshold whether it should be capitalized either as a noun or a verb.  <u>The Oxford English Dictionary</u>, to which we typically defer, weighs in with capitalization in both uses, in part because the device was developed by Taser Systems, Inc. in Los Angeles.  <u>See</u> XVII <u>The Oxford English Dictionary</u> 665 (2d ed. 1989).  But in its current online edition, the <u>OED</u> editors concede "also with lower case initial." <u>Available at</u> http://www.oed.com/view/Entry/271927?result=2&rskey=EMZywT& (last visited today).  But the <u>OED</u> even online prefers the capitalized form, and that is what we will use here.

[3] In addition to citing cases from the Eastern District of Pennsylvania, Boyden relies on cases from the Eleventh Circuit, the Eastern District of Michigan, and other district courts around the country, which, of course, do not control here.  We do not address every case Boyden cites; instead we refer primarily to cases from this district and we draw comparisons to opinions outside of our Circuit where useful to our analysis.

We first consider cases where courts have concluded that the use of a Taser is reasonable.  In Buckley v. Haddock, 292 Fed. Appx. 791 (11th Cir. 2008), the Eleventh Circuit found that a sheriff's deputy was entitled to summary judgment on qualified immunity grounds where the deputy had Tasered a motorist while arresting him after a traffic stop.  The traffic stop took place at night on an unlit, two-lane highway.  Id. at 792.  Upon receiving a ticket, the driver began sobbing and refused to sign the citation.  He offered to be arrested instead, and the deputy handcuffed him while he was still in his car.  The driver got out and began walking toward the patrol car, then dropped to the ground and refused to get up.  Id.  He continued sobbing, and when the deputy warned him of danger from passing traffic, he said, "My life would be better if I was dead."  Id.  The driver refused to stand after the deputy asked him several times to do so, and the deputy warned that he would Taser him if he did not stand up.  Id.  The deputy Tasered him, and, when another officer arrived, the two escorted the driver to the patrol car.  Id. at 792-93.  The Eleventh Circuit found that the use of the Taser "was not outside the range of reasonable conduct under the Fourth Amendment" because: (1) "the incident occurred at night on the side of a highway with considerable passing traffic", (2) "the deputy could not complete the arrest -- that is, truly control Plaintiff -- because Plaintiff was resisting", and (3) "the deputy resorted to using the taser only after trying to persuade Plaintiff to cease resisting, after attempting to lift Plaintiff, and after repeatedly and plainly warning Plaintiff that a taser would be used."  Id. at 794.  The Court stressed that "to the extent the incident occurred beside an active highway at night, we also credit the government's interest in the safety of [the deputy], Plaintiff, and even passing motorists", id. at 794-95.

The Eleventh Circuit again found the use of a Taser reasonable where an arrestee, handcuffed and seated in the back of a police car, refused to open his mouth in a manner that

would allow police to search for contraband after the police officers saw white flakes in his beard that they believed to be cocaine.  See Sanders v. City of Dothan, 409 Fed. Appx. 285, 287 (11th Cir. 2011).  The Court emphasized that the officer had "tasered Sanders in furtherance of the legitimate law-enforcement activity of searching for contraband in Sanders' mouth to prevent him from possibly destroying it by swallowing the contraband."  Id. at 290.

Though the Eleventh Circuit's precedent does not bind us, it serves as a useful point of comparison for this district's treatment of Tasering during arrest.

Courts in our district have repeatedly refused to find the use of a Taser on a handcuffed arrestee to be reasonable at the motion to dismiss stage.  In Gorman v. Warwick Twp., No. 10-6760, 2011 WL 1235198 (E.D. Pa. Apr. 1, 2011) (Joyner, J.), police pulled a driver over because they suspected she was under the influence of alcohol or a controlled substance. They handcuffed her and escorted her to the police car, and she averred that while she was "entering the police cruiser 'in the manner in which she was instructed'" a police officer "stepped in and suddenly administered a Taser stun to [her] right hip area while her back was towards him", id. at * 1 (alteration in original).  The officer then "'continued to administer multiple Taser stuns' to her body 'resulting in multiple Taser wounds as well as other physical and psychological injuries . . . '".  Id.  Judge Joyner found that the plaintiff had "sufficiently alleged a potential violation of her constitutional right to be free from an unreasonable seizure under the Fourth Amendment . . . ."  Id. at *9.

Similarly, in Garey v. Borough of Quakertown, No. 12-799, 2012 WL 3562450 (E.D. Pa. Aug. 20, 2012) (Baylson, J.), the plaintiff alleged that after the police arrested, searched, and placed him in the back of a patrol car, he "was pulled out of the vehicle and searched again, at which point [the officers] stunned him with a Taser, allegedly without

provocation.  Plaintiff was Tasered a second time, again allegedly without provocation."  Id. at
*1.  The plaintiff alleged that when the officers used the Taser, he "posed no threat to the police
and did not attempt to fight or injure the officers or anyone else."  Id.  But Judge Baylson
nevertheless found "[a]t this juncture, Plaintiff has sufficiently alleged a violation of his
constitutional right to be free from an unreasonable seizure under the Fourth Amendment."  Id. at
*4.

      Here, Boyden alleges that he "was already in custody and restrained by handcuffs,
and showing no attempt to resist."  Comp. ¶ 18.  The police affidavit attached to the complaint
documents Boyden's verbal resistance, but evidence of his physical resistance is lacking.  It is
clear from the affidavit that Boyden walked to the police car, and he appears to have been
standing when the officer reported that Boyden "refused to sit in the back of the unit."  The
report contains no explanation about the manner of Boyden's physical resistance, saying only
that he "continued to actively resist."  Moreover, the report reveals no immediate threat to the
safety of Boyden or the officers -- there was no suspicion that Boyden was armed, the event took
place in the middle of the day in a cemetery, and there were three police vehicles and at least as
many officers present.

      Though the defendants argue that "the Affidavit of Probable Cause . . . makes it
clear that it was reasonable to tase Plaintiff to effectuate the arrest", Def. MTD at 5, the record
does not bear out this conclusion.  Though further factual development may reveal the use of
force to be reasonable at this stage, Boyden has sufficiently alleged a claim of excessive force.

      The defendants' argument that because "Plaintiff was convicted of
(Misdemeanor) Disorderly Conduct under 18 Pa.C.S.A. § 5503(a)(1)" he is "estopped from
making any allegation here that he cooperated with police" is equally unavailing.  Id. at 7.

Defendants appear to invoke the doctrine of issue preclusion, whereby "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation", Burlington Northern R.R. Co. v. Hyundai Merchant Marine Co., 63 F.3d 1227, 1231 (3d Cir. 1995) (quoting Montana v. United States, 440 U.S. 147, 153 (1979)).  In order for issue preclusion to apply, the issue a party seeks to preclude must (1) be the same as the issue in a prior action, (2) have been actually litigated and decided by a final and valid judgment, and (3) have been essential to the prior determination.  Id. at 1232.  Here, the Criminal Docket reveals only that Boyden pled guilty to 18 Pa. Cons. Stat. Ann. § 5503(a)(1), which makes criminal "disorderly conduct" by "engag[ing] in fighting or threatening, or in violent or tumultuous behavior" "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof".  From the equivocal record to date, we cannot say that the issue of Boyden's cooperation with police was "essential to" the determination in the Court of Common Pleas. More to the point, as part of the plea the Commonwealth dropped the charge of resisting arrest, thereby undermining defendants' view that Boyden's record shows conclusively that he resisted the officers' attempts to arrest him.

Finally, we will address Devoe v. Rebant, No. 05-71863, 2006 WL 334297 (E.D. Mi. Feb. 13, 2006), a case Boyden identified and that defendants have described as "directly on-point."  Def. Reply at 6.  In Devoe, Terrance DeVoe -- an off-duty police officer -- was on the street in front of his house removing tools from his truck when police officers, responding to a call that a "suspicious occupied vehicle" was parked on a street nearby, pulled up and asked him to come over.  Devoe, 2006 WL 334297 at *1.  Devoe replied by saying something -- the parties disputed what -- and walked away.  Id.  He refused to give the officers identification, saying,

"I'm not giving you a damned thing," "this is bullshit," and "go ahead lock me up." Id.  After

handcuffing him, the officers eleven times asked Devoe to get into the patrol car, and when he

refused, they physically tried to get him into the police car.  When he resisted, they used the

Taser on him.  The district court found that the use of force was reasonable under the

circumstances:

> Attempting to physically force Mr. DeVoe into the vehicle likely
> would have escalated the situation into a physical struggle in which
> Mr. DeVoe or the officers could have been seriously injured.  The
> Court therefore concludes that Officer Sommerfeld's single use of
> the taser gun causing a one-time shocking which did not inflict any
> serious injury was a reasonable use of force under the
> circumstances.

Id. at *6.

> The defendants argue that here, as in DeVoe,
>
> Plaintiff belligerently invited police to physically engage him.
> Police wisely recognized that any attempt to physically overpower
> Plaintiff into the vehicle would have only escalated the situation
> and increased the risk of injury to themselves and/or Plaintiff.
> Thus, the use of the taser on Plaintiff here was not only objectively
> reasonable, but prudent.

Def. Reply at 8.  Notably, DeVoe was decided on a motion for summary judgment where the

factual record was presumably more fully developed.  But on the record before us we cannot say

whether "any attempt to physically overpower Plaintiff into the vehicle would have only

escalated the situation", and so, as we explained above, we cannot yet conclude that the use of

the Taser was objectively reasonable.

### b.   Whether The Right Was Well-Established

If a plaintiff alleges facts sufficient to find a violation of a constitutional right, we

must then determine whether the right was "clearly established at the time of defendant's alleged

misconduct." <u>Pearson</u>, 555 U.S. at 232 (internal quotations omitted).  We agree with Judge

Joyner's assessment in <u>Gorman</u>:

> While the use of a Taser in the course of an arrest may be a
> discretionary decision on the part of an individual officer that is
> dependent on the circumstances then and there being presented, a
> reasonable law enforcement officer should know that excessive
> uses of Taser stuns to effectuate an arrest would constitute a Fourth
> Amendment violation.

<u>Gorman</u>, 2011 WL 1235198 at *9.  We will therefore deny the motion to dismiss the claims

against Officer Sides on qualified immunity grounds.

### 2. <u>Stating A Claim Under § 1983</u>

As the Supreme Court has explained, "[b]y the plain terms of § 1983, two-and

only two-allegations are required in order to state a cause of action under that statute.  First, the

plaintiff must allege that some person has deprived him of a federal right.  Second, he must

allege that the person who has deprived him of that right acted under color of state or territorial

law." <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980).  Because we have found that Boyden has

alleged facts sufficient to state a claim of a violation of a constitutional right against Officer

Sides, and the defendants do not dispute that Officer Sides acted under color of state law,

plaintiff has stated a claim under § 1983.  We will therefore deny the defendants' motion to

dismiss that claim against Officer Sides.

### B. <u>Liability For Upper Darby Township Under *Monell*</u>

### 1. <u>Stating A Claim For Municipal Liability Under § 1983</u>

<u>Monell</u> held that a municipality is not liable for the constitutional torts of its

employees on a theory of <u>respondeat</u> <u>superior</u> -- that is, a municipality cannot be held liable for

its employees' torts solely by virtue of that employment relationship.  See Monell, 436 U.S. at

691.  Instead, a municipality will be liable for its employees' violations of §1983 rights only

where "execution of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."

Id. at 694.

        A plaintiff can demonstrate the existence of a government policy by showing

"that a 'decisionmaker possessing final authority to establish municipal policy with respect to the

action' issued an official statement of policy."  Jimenez, 503 F.3d at 250 (quoting Pembaur v.

City of Cincinnati, 475 U.S. 469, 481 (1986)) (internal alterations omitted).  In order to show a

custom, a plaintiff must establish that there exists "a course of conduct" among state officials

which, "though not authorized by law", is "so permanent and well settled" that it "operate[s] as

law." Id. (citing Monell, 436 U.S. at 690).

        In either case, "the Plaintiffs have the burden of showing that a government

policymaker is responsible by action or acquiescence for the policy or custom", id.  (citing

Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)).  But this requirement

"does not mean . . . that the responsible decisionmaker must be specifically identified by the

plaintiff's evidence" because practices so permanent and well-settled as to constitute a custom

under Monell "are ascribable to municipal decisionmakers."  Bielevicz v. Dubinon, 915 F.2d

845, 850 (3d Cir. 1990) (quoting Anela v. City of Wildwood, 790 F.2d 1063, 1067 (3d Cir.

1986)).  Thus, even if a custom "has not been formally approved by an appropriate

decisionmaker", it "may fairly subject a municipality to liability on the theory that the relevant

practice is so widespread as to have the force of law."  Bd. of Cnty. Comm'rs v. Brown, 520 U.S.

397, 404 (1997).

Determining who is an official "possessing final authority to establish municipal policy" is not a question of fact, but a question of state law.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).

In order to be liable under § 1983 "the government must act with deliberate indifference to the purported constitutional deprivation . . . .", Jimenez, 503 F.3d at 250.  As a result, a failure to train may constitute a policy or custom giving rise to § 1983 liability for a municipality only if the failure demonstrates deliberate indifference to residents' constitutional rights.  See City of Canton v. Harris, 489 U.S. 378, 389 (1989).  A failure to train evidences deliberate indifference if

> in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

City of Canton, 489 U.S. at 390.

There must also be "a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability."  Jimenez, 503 F.3d at 249-50 (quoting City of Canton, 489 U.S. at 385).  As our Court of Appeals has explained, causation is often a question for the jury:

> to sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation - i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury.  If the City is shown to have tolerated known misconduct by police officers, the issue whether the City's inaction contributed to the individual officers' decision to arrest the plaintiffs unlawfully in [a given] instance is a question of fact for the jury.

Bielevicz, 915 F.2d at 851.

2.    **Discussion**

The defendants first contend that Boyden's <u>Monell</u> claims must fail because "Plaintiff acknowledges in his Amended Complaint that the use of excessive force violates municipal policy and procedure in Upper Darby Township." Def. MTD at 11. It is true that Boyden alleges that two other Upper Darby police officers were fired because they used excessive force in "violation of Township and Police Department Policy and Procedure", Comp. ¶ 20 n.1, but this is not fatal to Boyden's claim. <u>Monell</u> liability attaches where a municipal custom -- not only a municipal policy -- causes a cognizable injury, and here Boyden avers that the Township "has a long-standing custom of employing unnecessary force upon the constituents it serves and of failing to train and/or discipline officers as to professionalism and the proportionate use of force." <u>Id.</u> at ¶ 19.

The defendants next argue that the <u>Monell</u> claim must succumb to dismissal because Boyden has "fail[ed] to state a claim for excessive force under the Fourth Amendment." Def. MTD at 12. As we held above, Boyden has alleged sufficient facts to state a claim for a violation of his Fourth Amendment rights, and so we will not dismiss the claims against the Township on this ground.

Finally, the defendants urge that the <u>Monell</u> claim must be dismissed because Boyden "<u>has failed to allege conduct by a municipal **policymaker**</u>". <u>Id.</u> at 13. Defendants argue that Superintendent Michael Chitwood, whom Boyden names in his complaint, "is <u>not</u> a final policymaker for Defendant, Upper Darby Township." <u>Id.</u> at 15 (emphasis in original). Indeed, in <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121 (3d Cir. 2010), our Court of Appeals explained that "as a matter of Pennsylvania state law, a township Police Chief is not a final policymaker."

Id. at 135 n.11 (citing 53 Pa. Cons. Stat. Ann. § 66902 (the township board of supervisors shall "organiz[e] and supervis[e]" township police officers)).  We agree that Superintendent Chitwood is not a final policymaker under Pennsylvania law.

Nevertheless, as we noted above, a plaintiff may state a § 1983 claim against a municipality by pleading facts sufficient to allow us reasonably to infer that he sustained a constitutional injury because of "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  Praprotnik, 485 U.S. at 127 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)).  Here, Boyden alleges that the Upper Darby Township Police Department has a custom of using excessive force when making arrests.  See Comp. ¶ 24.  To be sure, this statement is a legal conclusion not entitled to the assumption of truth, see, e.g., Santiago, 629 F.3d at 130 (citing Iqbal, 556 U.S. at 678)).  But Boyden also asserts facts to support his claim that the officers acted pursuant to a custom of allowing excessive force during arrests.  Boyden alleges that two Upper Darby officers were fired for use of excessive force and were then re-instated, see Comp. ¶ 20; ¶ 20 n.1.  He also cites two cases in which plaintiffs sued Upper Darby police officers for the use of excessive force during arrests.  Finally, he avers that Officer Sides participated in the beating of a Giovanni Mucci in September of 2013, and during that assault Officer Sides repeatedly used his Taser.  Id. at ¶ 22-23.

These allegations, taken as true, suffice to state a claim that Upper Darby officers acted pursuant to a municipal custom condoning the use of excessive force during arrests.  Similar assessments from our colleagues in this district on motions to dismiss fortify our conclusion.  For instance, in Garey, 2012 WL 3562450, at *6, Judge Baylson found that a complaint could "be fairly interpreted as alleging the existence of a municipal policy or custom"

where the plaintiff alleged that: (1) the municipality "failed to properly train [the officers] in how to properly place a prisoner in custody in a police car without resorting to use of a Taser when that suspect is already handcuffed, in a police car, and poses no physical threat"; (2) officers had "a history of verbal and physical abuse and police brutality toward citizens in circumstances similar to those" alleged in the complaint; and (3) the municipality had "permitted, tolerated, and negligently overlooked the inappropriate use of Tasers by its officers and failed to train them in the proper use of Tasers on arrestees." See also, e.g., Gorman, 2011 WL 1235198 at *6 (denying a motion to dismiss Monell claims where the plaintiff alleged that "[a]t the time of this incident, it was the policy, practice and/or custom of Warwick and its police officers to use excessive force and intimidate citizens" and "the Constitutional violations suffered by plaintiff were the result of Warwick's failure to properly train and supervise its officers with regard to the proper methods of making stops without intimidating citizens and wrongfully using excessive and unreasonable force").

We will therefore deny the defendants' motion to dismiss the claims against the Township.

**C.   State Law Claims**

Boyden also makes a claim of assault and battery against Officer Sides alleging that he "intentionally caused offensive contact to Plaintiff's person without consent or privilege", Comp. ¶ 42, and "[t]he Defendant, during his course of offensive and unwanted contacts with the Plaintiff caused Plaintiff to[] reasonably believe that he would immediately suffer further batteries." Id. at ¶ 44.  Boyden brings this claim against Officer Sides in his individual capacity. See id. at ¶ 45.

Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (quoting Cohen v. Lit Brothers, 70 A.2d 419, 421 (Pa. 1950)). In making a lawful arrest the police may use "such force as is necessary under the circumstances to effectuate the arrest." Id. Thus, the "reasonableness of the force determines whether the police officer's conduct constitutes an assault and battery", id., and so "[a] claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery." Garey, 2012 WL 3562450, at *5 (internal quotations omitted).

The defendants move to dismiss this claim on the ground that Boyden's conviction for disorderly conduct shows that the arrest was lawful and that the facts contained in the affidavit of probable cause show that "the use of the taser was necessary to effectuate the lawful arrest of Plaintiff." Def. MTD at 15.

This argument is the same one we rejected above. Taking the facts Boyden has pled as true, he has stated a claim for excessive force, and so he has also stated a claim for assault and battery. We will therefore deny the motion to dismiss as to this state law claim. See also, e.g., Garey, 2012 WL 3562450 at *5 ("Plaintiff has adequately stated a claim for excessive force. Therefore, Plaintiff has also adequately stated a claim for assault and battery").

## D. **Discovery Motion**

The defendants have also filed a motion to compel discovery. They seek responses to their first set of interrogatories and first request for production of documents -- which they served on Boyden on January 21, 2014, and to which Boyden has not responded.

22

Boyden has filed no response to the motion to compel, which the defendants filed on March 5, 2014, and so we will grant it as unopposed.  <u>See</u> Loc. R. Civ. P. 7.1(c) ("any party opposing [a] motion shall serve a brief in opposition together with such answer or other response that may be appropriate, within fourteen (14) days after service of the motion and supporting brief . . . .").

**V.    <u>Conclusion</u>**

   We will therefore deny the defendants' motion to dismiss and grant their motion to compel discovery.

BY THE COURT:

<u>/S/ STEWART DALZELL, J.</u>